780 P.2d 454

Larry WALKER and Doris L. Walker, husband and wife; Basketball Congress International, Inc., an Arizona organization; and Basketball Congress of Arizona, an Arizona non-profit association, Plaintiffs/Appellants,

v.

STATE of Arizona; J. Elliott Hibbs and Mary Hibbs; Greg Smith, a single man, Defendants/Appellees.

No. 2 CA–CV 89–0030.

Court of Appeals of Arizona, Division 2, Department A.

May 18, 1989.

Review Denied Oct. 11, 1989.

Lee, Stegall & Katz by Charles T. Stegall and Maureen Gaughan, Phoenix, for plaintiffs/appellants.

Kimble, Gothreau & Nelson by Michael P. Morrison, Tucson, for defendants/appellees.

## OPINION

LIVERMORE, Presiding Judge.

After a newspaper article critical of the enforcement by the Arizona Department of Revenue of laws relating to bingo, the director of the department, defendant J. Elliott Hibbs, held a press conference at which he read the following statement:

Good afternoon. I asked you to join me this afternoon to talk about a growing problem in Arizona's bingo industry.

Legalized bingo began in Arizona in 1972 as a means for non-profit organizations to raise money. Bingo was like the game you played as a kid, except there were cash prizes. The law said all profits must go to charitable purposes ... and that only charity members could work at the games.

That first year, 338 groups became licensed and garnered gross revenues of only about five million dollars.

From those humble beginnings, we have seen the wholesale commercialization of bingo into a forty million-dollar-a-year gambling industry. The largest games now gross more than one million dollars a year and use the most sophisticated electronic equipment to call bingo numbers. Entire buildings now are bought solely for playing bingo.

And that 40 million dollars? It's received in cash. Daily. That's very alluring to criminal elements adept at skimming from cash transactions. In the last few months, it has become apparent that profiteering promoters are infiltrating some bingo games to make six-digit incomes. A few start their own games by using false information to claim they are qualified for a license. Others worm their way into bona-fide charities so they can manipulate the tens of thousands of dollars in cash.

Let me give you some examples of what our investigations have found:

1. One bingo operator reported a burglary of bingo funds. Only days later, he suddenly came up with the money to pay off a mortgage, which just happened to be for about the same amount of money supposedly stolen.

2. In predatory tactics that are all common, promoters have charged charities ridiculous amounts for facilities and supplies.

3. These envelopes here contain the results of two bingo audits just completed. They disclose more than 700 violations of the law in the past three years, mostly violations involving misuse of money.

4. And worst of all, there have been threats and actual physical violence in incidents related to bingo.

The situation has become intolerable, and we aim to put an end to it.

We are initiating, today, a two-pronged assault on bingo corruption.

Part one is to investigate and ferret out the unsavory characters dealing from the licensed bingo operations. Ralph Milstead of the Department of Public Safety has pledged support to help in the criminal investigations.

We will increase the staff of our bingo enforcement unit by hiring six more people to investigate bingo operators.

To help in these investigations, we will automate our bingo records. We will be able to cross-check to find people working in more than one operation, which indicates that illegal promoters are involved. It also will help us verify that similar-sized games produce similar-sized proceeds.

We will also compare income and sales tax records of these bingo promoters to determine if they are underreporting their income.

Part two of our crackdown is to make bingo licensees put their own houses in order. The vast majority of licensees are making good-faith efforts to follow bingo laws.

Too many others are shirking that responsibility, and the law says if they can't keep their games clean they must be shut down. Our enlarged investigative staff will do that.

We expect to initiate stern enforcement action against several licensees before the end of this week. Additionally, I have ordered the detailed investigations of other games which may lead to further disciplinary actions.

Finally, we will go through the bingo laws with a fine-toothed comb to strengthen the statutes to fight bingo corruption. We will recommend bills for the next legislative session. One of those bills will call for abolition of the laws requiring that bingo records be kept confidential.

We think opening operations to public scrutiny is an important element in exposing bingo violations.

Through measures I have described in the past few minutes, we are going to drive corrupt elements out of Arizona and keep bingo clean.

Four days after the press conference, action was initiated to revoke the licenses

of plaintiffs Basketball Congress International, Basketball Congress of Arizona, and Larry and Doris Walker, the officers of those organizations. At the resulting administrative proceeding, the hearing officer found that violations of regulations had occurred. He concluded, however, that because the violations were "technical" in nature and would likely have been corrected by plaintiffs had they been notified of them by the department, license revocation was not required. Plaintiffs then brought this action for defamation and malicious prosecution against the State, Hibbs, and Greg Smith, the press liaison for the department. On this appeal from a jury verdict in favor of the defendants, numerous errors are asserted. We affirm.

■ Because Hibbs and Smith were discussing the operation of their department, they were protected by a qualified privilege in a defamation action under the ruling in *Chamberlain v. Mathis*, 151 Ariz. 551, 729 P.2d 905 (1986). Plaintiffs, however, argue that this privilege was lost because Hibbs' statement that two bingo audits revealed 700 violations itself violated the confidentiality rule in A.R.S. § 42–108(A)(3)(d) prohibiting revelation of "any statement of receipts or expenses or other information required to be filed concerning games of bingo." Taken literally, the statement by Hibbs reveals no information required to be filed. Instead it is a conclusion that the information filed shows violations of law. We believe that the statute should be read literally. Its obvious purpose is to protect the privacy of individuals and organizations required to file reports or returns with the department. That privacy was not invaded in this case. The statute was not designed to prevent public reports about conclusions that might be drawn from reported information so long as not tied to the individual or organization reporting. *See* A.R.S. § 42–108(D)(9) ("The department may disclose statistical information gathered from confidential information if it does not disclose confidential information attributable to any one taxpayer or claimant of unclaimed property.").

■ Plaintiffs next argue that because Hibbs ultimately would pass on any sanction arising out of an administrative hearing, he was not entitled to a qualified privilege. We are cited no authority for this novel proposition and we reject it. A public officer charged with both administration and review cannot be disempowered to speak freely about the former because he may be called upon to perform the latter. One reason supporting the existence of a qualified privilege in a case such as this is that a public officer ought not be discouraged from reporting on the activities he supervises by the threat of litigation. If he is, the public will suffer from governmental secrecy. That reason applies equally whether or not the officer has an ultimate reviewing function.

Next plaintiffs contend that the trial court erred in instructing on the privilege in the exact language of the court in *Chamberlain, supra.* It is not often that trial courts are criticized for following the Arizona Supreme Court. It surely was not error.

■ Plaintiffs also argue that the trial court erred in requiring that actual malice be proved by clear and convincing evidence. There is surprisingly little authority directly on point on this question. We believe that the trial court was correct in its conclusion. ' The "clear and convincing" standard was first announced in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), where a qualified privilege was created in defamation actions for criticism of public officials. The court there stated: "Such a privilege for criticism of official conduct is appropriately analogous to the protection accorded a public official when he is sued for libel by a private citizen." 376 U.S. at 282, 84 S.Ct. at 727, 11 L.Ed.2d at 707. In each instance the privilege is designed to promote uninhibited, robust, and wide-open debate on public issues. The same standard of proof ought to protect both the critic of government and the government officer required to explain or defend governmental action.

Plaintiffs complain of three evidentiary rulings. The testimony of another licensee who had been subjected at the same time to an unsuccessful effort at license revocation was excluded under Rule 403, Ariz.R.Evid., 17A A.R.S., as likely to confuse the issues. Because any impropriety in the department's handling of that case had little, if any, probative value on the issue of whether the information within the department's possession concerning plaintiffs could have led to the reasonable belief that the statements concerning plaintiffs were true, the *Chamberlain* test, it was properly excluded. Conversely, the two exhibits containing the information available to the department at the time of the press conference and the initiation of the administrative proceeding were properly admitted for the non-hearsay purpose of establishing reasonable belief in the defamation action and probable cause in the malicious prosecution action. *See* M. Udall & J. Livermore, *Arizona Practice: Law of Evidence* § 122 (2d ed. 1982).

Plaintiffs' final argument is that the trial court should have directed a verdict in its favor on the issue of probable cause to begin the administrative proceeding because an administrative regulation, effective at the time of violation but not at the time the proceeding was initiated, required the department to notify the licensee of any violation and to direct it to discontinue the violative conduct. We are reluctant to read this regulation as prohibiting revocation for violations, no matter how egregious, without first offering an opportunity for correction. Misconduct ought not be encouraged by offering blanket immunity for all violations occurring before first discovery of wrongdoing. But even if the former rule could be read that way, it has no application to bar a proceeding initiated after its revocation.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.